

# NUMBER 13-13-00631-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

### THE STATE OF TEXAS FOR THE BEST INTEREST
### AND PROTECTION OF C.B.

### On appeal from the Probate Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Perkes
### Memorandum Opinion by Justice Rodriguez

This is an appeal from an involuntary commitment proceeding under the Texas

Mental Health Code. TEX. HEALTH & SAFETY CODE ANN. § 571.001 (West, Westlaw

through 2013 3d C.S.). Appellant C.B.[1] challenges the trial court's judgment that

---

[1] Although not required by rule or statute, we will use appellant's and her family members' initials to protect appellant's privacy in this mental health proceeding. *See, e.g., State ex rel. T.M.*, 362 S.W.3d 850, 851 (Tex. App.—Dallas 2012, no pet.) (using initials to describe psychotic bipolar adult challenging her temporary involuntary commitment); *L.S. v. State*, 867 S.W.2d 838, 840 (Tex. App.—Austin 1993, no writ) (using initials to refer to mentally disabled adult appealing an order extending an involuntary commitment to a state hospital).

ordered extended inpatient mental health services for her at the Rio Grande State Center (the Center), a mental health facility. By one issue, appellant argues that the evidence adduced at the commitment hearing was legally insufficient to support jury findings under section 574.035(a). *See id.* § 574.035(a) (West, Westlaw through 2013 3d C.S.). We affirm.

## I. BACKGROUND

### A. Procedural History

On August 22, 2013, Susan Fuller, a court liaison, filed an application for appellant's emergency apprehension and detention and an application for extended commitment for mental illness. Fuller alleged that appellant was mentally ill and was likely to cause harm to herself and, if not treated, would continue to suffer emotional and mental distress, would continue to experience deterioration of her ability to function independently, and would be unable to make a rational and informed decision as to whether to submit to treatment. In her application for emergency apprehension and detention, Fuller further indicated that appellant had been diagnosed with and had been suffering from schizophrenia "for decades," had started fasting at God's request, had stopped taking her medications, and had threatened to bomb the San Juan Shrine.

On the same date, the State filed a motion for protective custody together with the requisite medical examination certificate from a physician substantiating the need for appellant's custody. The trial court then issued an order to detain appellant pending a final hearing.

2

**B. The Commitment Hearing**

On October 15, 2013, a jury heard the application. The following witnesses testified for the State: (1) psychiatrist Daniel Villarreal, M.D.; (2) appellant's daughter C.O.; and (3) social work manager Mike Torres. Appellant testified in her case-in-chief.

**1. Psychiatrist Daniel Villarreal, M.D.**

Dr. Villarreal, a psychiatrist at the Center where appellant was a patient, testified that he had treated appellant since the beginning of 2013. He confirmed that appellant was diagnosed with schizophrenia. According to Dr. Villarreal, appellant's schizophrenia manifested itself through delusions, specifically delusions where she communicates directly with Jesus Christ. Dr. Villarreal explained that while under his supervision, appellant had threatened to stop eating and had refused to take her medication. Dr. Villarreal believed that because of appellant's lack of insight into her condition, her refusal to take medication or to eat, and her conviction that she has divine protection, appellant would endanger herself or others. Although Dr. Villarreal heard about appellant being aggressive and putting herself in dangerous situations, he had not witnessed such conduct or behavior. In closing, Dr. Villarreal responded to the following questions asked by the State:

Q. Okay. Now, at this time do you believe [C.B.] can make a rational and informed decision whether to submit to treatment?

A. No.

Q. Why do you believe she cannot?

A. Because I think her judgment and her insight are impaired by her delusions, and that that's above anything else, and not enough explaining, trying to rationalize in regards of her treatment and how it

3

might improve some of her conditions would be—she would be able to even consider.

Q. Okay. And so at this time can you tell this jury what is your expert opinion as to the type of treatment that [C.B.] needs?

A. [C.B.] suffers with schizophrenia, and the primary treatment for schizophrenia has to do with medications for her hallucinations and delusions. These are called antipsychotics. She has taken medicines like this in the past with some improvement, so I think that we would most likely ask of the Court to allow us to use the medications again, hopefully that we can see that improvement that we've had before.

## 2. Daughter C.O.

C.O. testified that her mother had been delusional and had demonstrated periods of erratic behavior and aggressiveness. C.O. indicated that, in her experience, appellant refused to take prescribed medication. C.O. expressed concern that if released from the mental health center, appellant would stop taking her medications and would hurt herself or others. C.O. related the following instances of appellant's mental instability: threatening to bomb the Pentagon in Washington, D.C.; asking C.O. to "help her get bombs to bomb some places for some great escape"; walking in front of a tractor-trailer rig, which the driver jackknifed to avoid hitting appellant; sitting Indian-style next to a busy road across from C.O.'s step-family's home; threatening to send bombs to their home; wandering the streets at night looking for C.O.; calling C.O. a demon that had to be purified; and telling C.O. that she "was going to ask God to send a necromancer[2] to rape [C.O.] to humble [her]." When the State asked C.O. if there was anything that was

---

[2] Merriam–Webster defines "necromancy" as "conjuration of the spirits of the dead for purposes of magically revealing the future or influencing the course of events." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/necromancy (last visited Oct. 15, 2014).

4

important for the jury to know regarding appellant's condition, C.O. answered, in relevant part, "[I]f you let her out, either she's never going to come back because she's going to get hurt or she's going to hurt somebody else.   Unknowingly."

### 3.   Social Work Manager Mike Torres

Torres, the manager of social work at the Center, testified that he worked at the hospital and had known appellant personally for more than eight years.   He explained that appellant was a special needs patient; that she had been at the Center since March 2, 2011, without being discharged or furloughed; and that she would fast on a regular basis.   He also testified that, in his opinion, appellant was not ready to be discharged from the Center because she posed a danger to herself and "eventually" to others.   When asked if he had seen any signs of psychosis over the last few months, Torres responded that until a few weeks before the hearing, appellant was "thinking very calmly, very rationally, able to make some pretty good decisions about her future," but then, as he testified below, the following occurred:

> You know, quite honestly, last week she left me a message that told me—a phone message that told me that she was decompensating pretty—she was definitely going back, backsliding.   It was a message where she was—there was some things that she wanted, she wanted her resume typed up, which I told her I would try to help her with, and she wanted to apply for some jobs online, but the message was that, you know, basically I needed to help her or she was going to tell Jesus to punish me.

Torres explained that appellant was "talking about fasting again and . . . that always leads to her putting her health at risk. . . .   She starves herself."   He also testified that appellant had tried to buy bombs and had threatened to bomb a shrine and to kill the Pope.   After this testimony, the following exchange occurred between the State and Torres:

Q.   Do you believe that she is ready to be discharged?

5

A.  No.

Q.  Do you believe that she poses a danger to herself if she is discharged?

A.  Yes.

### 4.  Appellant

Through her own testimony, appellant confirmed that at times she would refuse her medication because of the side effects it produced—facial hair, weight gain, and acne. Appellant testified that she would take her medication, provided it was not the generic brand because she was "allergic to the fillers inside generics."  And she explained that although she would take "her" medication, she would not take "the doctor's medication," or "the hospital's medication."  Appellant reasoned "it's been my experience that when [the doctors and hospital] choose a medication for me, it's really something that they believe will work, but they don't have any experience being in my body and knowing my side effects and then my allergies."  Appellant testified that she would fast as a cleansing ritual because Jesus told her to do so.  She indicated that she takes care of herself, her health, and her appearance.

Appellant also testified that her roommate physically attacked her and that she feared for her safety.  On cross-examination, appellant referenced an instance of an alleged rape at the Center and her miscarriage.  She talked about the spirit of that child and explained that the spirit of her own mother who died in 2008 haunted her.  Appellant explained that Dr. Igoa, a psychiatrist at the Center, was making a building where she could work because he had caused her to gain weight through the medication he had administered.  Appellant confirmed that Jesus had appeared to her and directed her to

6

bomb the shrine because it was blasphemous. She further testified that she has sought to obtain bombs. Nonetheless, appellant reiterated, without hesitation, that she would not hurt herself.

## C. Findings, Judgment, and Appeal

At the conclusion of the trial, the jury found for the State on all of the elements required for extended inpatient mental health services contained in section 574.035(a). Consistent with the jury's verdict, the trial court entered a judgment ordering extended inpatient mental health services for appellant. This appeal followed.

## II. APPLICABLE LAW

Extended inpatient mental health services may be ordered if it is found by clear and convincing evidence that the proposed patient is mentally ill and that the patient's behavior satisfies at least one of three criteria as a result of that mental illness. *See id.* § 574.035(a). The three criteria are: (1) the patient is likely to cause serious harm to herself; (2) the patient is likely to cause serious harm to others; or (3) the patient is suffering severe and abnormal mental, emotional, or physical distress, is deteriorating in her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment. *Id.* § 574.035(a)(2)(A)–(C). As the statute is written in the disjunctive, finding any one of the three grounds makes the commitment order valid. *See T.G. v. State,* 7 S.W.3d 248, 251 (Tex. App.—Dallas 1999) (no pet.).

Case law and the legislature have set out that

[t]he trial court[, or in this case, the jury,] must find by clear and convincing evidence the statutory criteria for a commitment order. *See A.S. v. State*, 286 S.W.3d 69, 71 (Tex. App.—Dallas 2009, no pet); *see also* TEX. HEALTH

7

&amp; SAFETY CODE ANN. § 574.03[5](a).  Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam).

*State ex rel. T.M.*, 362 S.W.3d 850, 851–52 (Tex. App.—Dallas 2012, no pet.); *see also*

*In re A.C.*, No. 13–13–00278–CV, 2014 WL 1369116, at *2 (Tex. App.—Corpus Christi

April 3, 2014, no pet.) (mem. op.).   In addition, section 574.035 sets forth specific

requirements for clear and convincing evidence under subsection (a).   *See* TEX. HEALTH

&amp; SAFETY CODE ANN. § 574.035(e).   The evidence must include expert testimony and,

unless waived, evidence of a recent overt act or a continuing pattern of behavior that

tends to confirm:   (1) the likelihood of serious harm to the patient or others; or (2) the

patient's distress and the deterioration of the patient's ability to function.   *Id.*   The

expert's opinions and recommendations must be supported by a showing of the factual

bases on which they are grounded and not simply on the statutory criteria.   *T.M.*, 362

S.W.3d at 852; *see also In re A.C.*, 2014 WL 1369116, at *2.   The recent overt act or

continuing pattern of behavior proven by the State must relate to the criterion on which

the court bases its judgment.   *In re C.O.*, 65 S.W.3d 175, 181 (Tex. App.—Tyler 2001,

no pet.).

### III.  STANDARD OF REVIEW

Because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review.   *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).   In reviewing a legal sufficiency claim, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.   *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

*T.M.*, 362 S.W.3d at 852; *see also In re A.C.*, 2014 WL 1369116, at *2.

8

## IV. DISCUSSION

By one issue, appellant argues that the evidence is legally insufficient to support certain findings under subsection 574.035(a). *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a).

### A. Unchallenged Findings

The jury found that appellant is a person with a mental illness that is expected to continue for more than ninety days and for which she has received court-ordered inpatient mental health services for at least sixty consecutive days during the preceding twelve months. *See id.* § 574.035(a)(1), (3), (4). Appellant does not contest these jury findings. However, she does challenge the jury's remaining findings regarding the grounds for commitment.

### B. Challenged Findings

Appellant complains that there is not clear and convincing evidence that as a result of her mental illness she is likely to cause serious harm to herself, the first ground for commitment. *See id.* § 574.035(2)(A). And she argues that the evidence does not support the jury's findings related to the third ground—that as a result of her mental illness she suffers severe and abnormal mental, emotional, or physical distress, experiences substantial mental or physical deterioration of her ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment.[3] *See id.* § 574.035(2)(C).

---

[3] C.B. also challenges the jury's finding that she is likely to cause serious harm to others. However, the trial court's October 7, 2014 order clarifying its previous judgment did not identify this ground as a basis for its judgment. So we need not address C.B.'s challenge to the jury's harm-to-others finding. *See* TEX. R. APP. P. 47.1.

### 1. Harm to Self

At the hearing, Dr. Villarreal provided expert testimony that appellant had a history of schizophrenia. He testified that appellant's schizophrenia manifests itself through delusions, specifically delusions that she communicates directly with Jesus Christ and that she has divine protection. He explained that appellant lacks insight into her condition. She has threatened to stop eating and has refused to take her medication. Dr. Villarreal believes that, based on the foregoing, if not committed, appellant would endanger herself. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(2)(A); *T.M.*, 362 S.W.3d at 852.

C.O. expressed concern that if released from the mental health center appellant would stop taking her medications. C.O. testified that appellant has threatened to bomb the Pentagon, C.O.'s family home, and other places, some at the request of Jesus; has sought C.O.'s help in getting bombs; has walked in front of a tractor-trailer rig, fortunately without any physical injuries; has sat on the side of a busy road and wandered the streets at night; and has told C.O. that she would "ask God to send a necromancer to rape [C.O.] to humble [her]." C.O. testified that if released, appellant would never come back because she would either get hurt, herself, or would hurt somebody else, albeit unknowingly.

Torres testified that appellant was not ready to be discharged from the Center because she posed a danger to herself. According to Torres, although appellant had been making "some pretty good decisions about her future," recently "she was definitely going back, backsliding." Torres based this opinion, in part, on a message that appellant left him regarding his offer to help with her resume and her job search. Appellant's

message stated "[Torres] needed to help her or she was going to tell Jesus to punish [him]." He also explained that appellant talked about fasting again, which "always leads to her putting her health at risk," to the point of starvation. He, too, testified that appellant had threatened to bomb a shrine and kill the Pope and had tried to buy bombs.

Finally, while appellant testified that she would not hurt herself, she also testified that at times she would refuse to take her medication because of allergies or side effects not understood by the doctors who prescribed them. Appellant testified that she would fast as a cleansing ritual because Jesus told her to do so. She spoke of the spirit of a child and the spirit of her mother who haunted her. And appellant confirmed that Jesus directed her to bomb a shrine.

Based on the above, we conclude that the State produced clear and convincing evidence to support its request for temporary commitment. The evidence was such that it could produce in the mind of the trier of fact a firm belief or conviction that appellant was mentally ill and, as a result of her illness, was likely to cause serious harm to herself. *See In re C.H.*, 89 S.W.3d at 25; *Addington*, 588 S.W.2d at 570; *see also* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(1), (2)(A). The evidence includes expert testimony and evidence of recent overt acts through Torres's testimony and of a continuing pattern of behavior through the testimony of all witnesses that tends to confirm the likelihood of serious harm to herself. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(e); *see G.H. v. State*, 94 S.W.3d 115, 117 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("Texas law does not require relatives or physicians of the mentally ill (or the courts) to stand idly by until serious harm occurs. . . . The purpose of temporary commitment is to avoid just such harm."). In this case, we conclude there is sufficient evidence, from both expert

11

and lay testimony, that appellant is likely to cause serious harm to herself.

### 2. Suffering Distress and Deterioration

Although the evidence need only establish one of the three grounds for commitment, *see T.G.,* 7 S.W.3d at 251, we nonetheless further conclude that the clear and convincing evidence was such that it could produce in the mind of the trier of fact a firm belief or conviction that appellant was mentally ill and, as a result of her illness, was suffering mental, emotional, or physical distress and the deterioration of the her ability to function. *See In re C.H.*, 89 S.W.3d at 25; *Addington*, 588 S.W.2d at 570; *see also* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(1), (2)(C). The testimony discussed above, which included pattern-of-behavior testimony—for example, appellant's refusal to take prescribed medications, her refusal to eat to the point of starvation, and placing herself in dangerous situations because of her conviction that she had divine protection—tends to confirm the likelihood that she is suffering distress and deterioration of her ability to function. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(e); *In re C.O.,* 65 S.W.3d at 181.

### C. Summary

Because the evidence was legally sufficient to support the findings and the trial court's judgment ordering appellant's commitment, we overrule appellant's sole issue.

### V. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 30th
day of October, 2014.

12